Thank you very much. Justices of the Ninth Circuit, my name is Michael Flanagan and I represent the Tumbaga family who is appealing a decision by the U.S. District Court finding no proximate cause in a medical malpractice case despite the fact that the court found numerous doctors at the Alaskan Native Medical Center negligent in regards to diagnosing vertebral artery dissection both by not running the right tests, not reading the tests correctly, the tests they did do, not recognizing the symptoms matched up with the expected complications of the person's injuries that had been recognized by the doctors and therefore not giving any treatment for a stroke and for the vertebral artery occlusions which were clots in his vertebral arteries. We're familiar with the District Court's ruling and the District Court made factual findings in this matter. Now you're on appeal and so tell us why the factual findings were erroneous. Well, first of all, the court used the wrong legal standard to decide the proximate cause issue. Under Alaska law, the standard is whether the negligence of the defendants was important enough in causing harm that a reasonable person would hold the negligent person responsible. That is not the standard that the court applied. What the court did is apply a standard that's never been used in Alaska, isn't reported in any case that was cited. The court didn't cite any cases to support this legal standard which was that in a case of negligent diagnosis, the plaintiff would have to prove that the treatment that would have prevented the harm was required by the standard of care of the doctors providing care to the patient. There's no case that holds that. And here's the problem with that. It makes an impossible burden for the plaintiff. In almost every medical case where there's a problem, there are various treatments that can be provided. And there was in this case. The doctors testified you could have given heparin or aspirin or closely observed the patient. Any of those were okay. And the doctors, the two neurosurgeons testified, both the plaintiff and the defendants, neurosurgeon experts testified that it was basically standard practice in a case like this to provide heparin that Dr. R. Expert testified that that was what the literature indicated and that's what was the standard for doctors doing, neurosurgeons doing this kind of treatment. You know, Mr. Flanagan, your opponent's going to tell us that on this record there's some reason to believe that there were barriers to giving your client aspirin, that it would not have been a good idea. The problem is... Do you have an answer to it? Yes. Do you think the record really would support that position? Not the defendant's position, because what the court did in this case is it basically did not credit the testimony of both the plaintiff and the defendant's neurosurgical experts, Dr. Shifrini Vasan and Dr. Shemek, and instead decided to rely on Dr. Eskridge, who was a neuroradiologist, who would have never been in a position to treat a patient with this problem, and he didn't say, he did not testify, it was below the standard of care not to provide this treatment because he knew that he was not board certified in this area, and so he didn't render any kind of an opinion like that. Rather, he said, I would not have provided heparin because of the risk of bleed. He would not have. But that wasn't what was going to happen anyway. There was no neuroradiologist that was going to decide the treatment. Bleeding with aspirin? Well, lesser with aspirin. With heparin, which was the preferred treatment, Dr. Shifrini Vasan testified, yeah, there's a risk of bleeding, but the risk of a stroke is even worse. This person has a clot, clots in both vertebral arteries, has already had a minor stroke, which is caused by the clot breaking loose, which was what heparin would prevent, and you're taking the risk of bleed, which he said was 10% or less, with the risk of a stroke, which we see what happens when that happens. We have a person who's now permanently disabled and not functional anymore, and so it's a judgment call. It's a judgment call by the doctor as to what to do, and both neurosurgeons, plaintiffs, and the defendants testified the usual practice, and their defendant's expert said his usual practice, in this kind of a case, was to provide heparin. And Dr. Eskridge admitted that he was not providing any opinion about standard of care. So what we have is the judge saying, I'm going to apply the wrong legal standard, which is that you're going to have to prove that it was below the standard of care not to give this particular treatment, and then she doesn't have anybody saying that it, that it, that agrees with the court on that, because, because what the two neurosurgeons said, it was within the standard of care to give the heparin or the aspirin, and what the, what Dr. Eskridge said is that he wasn't going to render an opinion on that. He wouldn't do it, but he wasn't going to say what the neurosurgeon should have done. ...best evidence that the standard of care required the administration of heparin. We had Dr. Frieda Vassa testified, you could administer heparin within five days of surgery, but she even admitted there is no absolute standard of care that requires a particular therapy. So here we have, fair to diagnose is one part of the problem, but fair to treat is also part of that inquiry, and I couldn't see, this is a very sad case, I mean I will concede that with you, but I don't see how you could show causation, because doing, administering no treatment was an acceptable standard of care, at that time. Right, but there are basically three treatments, heparin, aspirin, or nothing. I mean, close monitoring basically. It's not doing nothing, it's close monitoring. But if that's the rule, how does the plaintiff prove the case? Because you've got three different remedies that the doctor can do, and all of them are acceptable, and two of them would have prevented, according to the neurosurgeons, would have prevented this second stroke, massive stroke, but you're not going to get anybody to say which one should have been done on a standard of care, because there's three different ones. So that's not the test. No court has said that. It's whether or not the negligence of the defendant was such that a reasonable person would find that responsibility for the action. Here, we have the doctors not running the right tests, not reading the tests correctly when they did it, not making the diagnosis. The court all found that was negligent, and therefore the client got no treatment, none. Nobody made a judgment call, because they didn't even know he had this problem. So I think that if the judge had to apply the correct standard, which is what we were asking you to do, tell the court you can't apply this second standard of care, proximate cause legal standard, because that's not Alaska law, and you have to apply Alaska law. And you have to go back and redo this case based on the correct standard, which is the one I just read to you about the substantial factor. To require us to meet a standard that's not required under Alaska law is basically creating new law, and there wasn't any basis for the judge saying why this new law should apply. I mean, she didn't justify it. She simply thought that that was the rule. But there simply isn't any legal basis for it. And so I would answer your question, Madam Justice, that we don't have to prove it was standard of care to not give the particular heparin treatment. All we have to do is prove that the negligence of these defendants was such that a reasonable person would attribute fault to them and decide that they were responsible for what happened. And otherwise, you're setting up a standard where any time there are multiple treatments, and that's usually the case in all medical cases, that there's more than one treatment that's available, and it's a judgment call as to which one you apply. And how can a plaintiff ever win a case if you're going to say, well, you've got to prove that they have to do this or that or the other? That's never going to be the case, except in rare instances. For instance, cancer. They can try radiology. They can try chemotherapy. They can try all these other methods. The doctor's going to say all those are acceptable. Well, then you're going to say, well, if you don't diagnose cancer, you can't prove approximate cause because it's three different things, and any of them would have been within the standard of care. Do you want to discuss the rest of your time, counsel? Yes, sure. Good morning, Your Honors, members of the court, counsel. My name is Gary Guarino. I'm an assistant U.S. attorney representing the United States. I was trial counsel and I'm also counsel for this appeal. Plaintiff's problem is Alaska law. There is no additional burden put on a plaintiff in this case. In every case of medical malpractice, a plaintiff has to prove the standard of care and breach of standard of care. And where it's a claim of a failure to diagnose and treat, you have to prove standard of care for diagnosis and standard of care for treatment. Now, in many cases, there's no dispute about what the standard of care is. If it's a failure to diagnose an infection, standard of care is you give antibiotics. So it's not a big issue at trial. But in some cases, it is an issue. You can have a failure to diagnose, and there can be a dispute as to whether the treatment that the plaintiff is proposing was the standard of care that was required. In this case, plaintiff's theory was if you diagnose the vertebral artery dissection and the stroke, first stroke, Dr. Kohler would have been required to give heparin five days after surgery. That was their theory. That's what their expert gave an opinion on. The government's experts and the treatment center and Dr. Kohler all testified there is no standard of care that requires the use of heparin post-surgery, meaning someone who's had a traumatic injury and surgery and has a serious risk of bleeding. There is no standard of care that requires heparin. It's an option that a physician can consider, and some physicians may give it several days after surgery. Some physicians may wait weeks. Some may never give it, depending on the particular patient and what the risks are. Let me ask you to clarify for purposes of the record. The evidence that the government relied on primarily was that Dr. Eskridge? No, Your Honor. Dr. Kohler is a neurosurgeon, was a treating neurosurgeon. He testified, and it's in the record, it's cited in the government's brief. In pages 9 to 12 in the government's brief, there's a summary of all the physicians who testified about standard of care. Dr. Kohler testified there is no standard of care that requires a neurosurgeon to give heparin to a surgical patient within five days after surgery. Dr. Eskridge, neurosurgeon, said there is no standard of care that requires heparin at any particular time. He said some physicians give it several days after surgery. Some would wait weeks. Some would just monitor. There is no standard of care that requires heparin. The article that was introduced in the evidence, which was an independent review of the medical literature, it's Exhibit E. It's at Record Excerpt 336 to 341. Separate physicians not connected with this case looked at the medical literature. They reviewed 19 studies on the use of heparin. The purpose of their article was to try and come up with standards for the use of, for the treatment of these types of injuries. At the conclusion of the review of the evidence, they said there is insufficient evidence to recommend standards, meaning they could not recommend a standard of care for the use of heparin. They couldn't even recommend guidelines because there was insufficient evidence. All they could say was heparin is one of the options that can be used for patients with these types of injuries. That was conceded. It is an option, but it is not a standard of care because the risks of heparin are extremely high. You have to weigh in each case what is the benefit that I might get from heparin, and it's not that heparin automatically works or always helps a patient. Sometimes it does. Sometimes it makes them worse. If you have evidence of bleeding, of hemorrhagic stroke, heparin can make it worse, can kill a patient. There was testimony from plaintiffs' experts and from the defense experts that heparin not only helps sometimes, but it can make situations worse, and patients have died from heparin. Dr. Eskridge also testified, and he said there's a narrow window in which heparin is most beneficial, which would be about eight hours after the stroke. He said after that the risks of heparin go way up, and he was the most emphatic of all the witnesses that you should not use heparin. But there were Dr. Kohler, Dr. Chevinck, Dr. Eskridge, the article that summarized the medical research, all said there's no standard of care for the use of heparin, and the court relied on all that evidence, including citation to Dr. Knappenberger in one of the finding of facts facts where he was a neurosurgeon or neurologist from the University of Washington who reviewed Mr. Tamaga, and she said in his testimony that some physicians give it several days, some wait weeks. That's the problem plaintiff has in this case. He has to prove standard of care. He couldn't, and so the court found you did not meet your burden of proof, and that is Alaska Statute 0955-540. It says you have to prove by a preponderance of evidence all of the elements. What is the standard of care? Did the physicians reach the standard of care? And then you get to causation. You don't jump from negligent diagnosis to causation. That's what plaintiff is doing in this case. I proved there was a negligent diagnosis, so let's just go to causation. No, no, no. You have to stop at treatment. It isn't enough to say you negligently diagnosed. The clearest example of that is when there's no treatment. That's the easiest example. When there's no treatment available, you don't get to causation because there's no treatment. The other time you don't get to causation is if there's no standard of care for treatment. Well, counsel, let me ask this. With respect to causation, why should we not conclude that the failure to diagnose the first stroke was a substantial factor in causing the second stroke? Because the only thing that would have prevented the second stroke would have to be a treatment that would have been required. If there was no treatment available, you wouldn't jump to causation. If there was no treatment that was standard of care, you wouldn't jump to causation. Plaintiff has to prove the intermediate step. You don't get to causation until you prove breach. In a medical malpractice case, there are two items of breach. Sometimes the parties argue over whether there was a negligent diagnosis. Sometimes they dispute whether there was a standard of care that required the treatment the plaintiff is suggesting. Sometimes they dispute both. In this case, the government disputed both. The district court found for the plaintiff on negligent diagnosis, found against the plaintiff on negligent treatment. You don't get to causation until you prove both of those first two elements because the same statute that establishes the elements says you can't presume negligence. Subsection D of that statute, 0955540, says here are the elements for medical malpractice, and the last subsection of that is there is no presumption of negligence. You can't presume that there was a negligent treatment. You have to prove that there was a negligent treatment. How do you prove negligent treatment? You prove the standard of care and you prove breach. They couldn't prove standard of care, so they couldn't prove breach of treatment. They don't get to causation. Now, counsel's argument about substantial factor versus the but-for test, that's irrelevant in this case. Those two different analysis apply when you have a case involving a single actor. You use the but-for test. When you have multiple actors or multiple potential causes, you may use the substantial factor. A typical law school example is you have two parties. One burns the forest down from the east side. The other one burns the forest down from the west side. Both of them could claim, well, it would have burned down anyway despite my actions, so you can't prove the but-for test, and the courts say no. They'll ask, well, that isn't it. If either of you contributed a substantial factor, we can find causation. But first you have to prove negligence. You don't go to the substantial factor test until you prove negligence, negligent diagnosis and negligent treatment. In fact, the cases that Zimbages cites for the substantial factor test from other jurisdictions, the Vinson case and Alta-Bates case, they involve cases of failure to monitor a pregnant woman during pregnancy. But in all those cases, the diagnosis failure was failure to monitor, but there was also evidence that the standard of care required specific treatments. Either you give oxygen or you deliver the baby earlier or you take other steps as a standard of care. So in that case it was established. The diagnosis, failure to monitor, and the breach of standard of care, failure to do the standard of care treatment. Here they didn't prove the second branch of negligence. They proved negligent diagnosis. They didn't prove breach of the standard of care and treatment. And so you don't get to whether you should have used substantial factor or but-for, and that wasn't even part of the court's analysis. What the court said was if you can't prove a breach of the standard of care for treatment, you don't get to causation. You can't prove that there was a cause of the second stroke. And then the court went one further and said even if you could prove that there was a standard of care and that they should have given heparin five days, the court found based on the testimony they failed to prove that it would have been effective. There was testimony from that article that was cited in evidence. Review of 19 studies, those authors concluded there was insufficient evidence of the benefit of heparin as opposed to its risks to recommend it as a standard of care or to even recommend guidelines. The reason they did that was because they looked at patients who were treated with heparin or who were just monitored, and they couldn't find enough benefit to justify establishing a standard of care when you considered the substantial risk of bleeding. The second thing in this case, several doctors, including plaintiff's expert Dr. Kirkwood, who was one of the radiologists who looked at the scans, said yes, Mr. Tambaga had an ischemic stroke, a stroke that was caused, the first stroke was caused by a blockage of the arteries that cut off blood flow to the brain. That's an ischemic stroke. A hemorrhagic stroke is where a blood vessel bursts and blood floods the brain. Those are two types of strokes. But they also testified you can have an ischemic stroke that turns into a hemorrhagic stroke. The reason for that is you get an ischemic stroke, it cuts off blood flow to the brain, the brain cells are damaged, they're weakened. Some are killed immediately, some are just weakened and are damaged. If you break up that blood clot and flood blood back into that brain, it can break through those damaged cells and you can get a hemorrhagic stroke as a result of an ischemic stroke. That's what Dr. Kirkwood saw on the MRI on November 8th. That's what Dr. Chivink testified about, about how an ischemic stroke can turn into a hemorrhagic stroke. And that's the risk of heparin. You have a patient with an ischemic stroke who had a blockage of blood flow, has damaged brain cells, and now you introduce a drug that's going to cause blood to flow into those brain cells, you can turn that into a hemorrhagic stroke. That's why they're very careful to look to see if there are signs of bleeding because that's a contraindication for heparin. You can make it worse. You can turn what was a stroke, maybe a minor stroke or a substantial stroke, into a catastrophic stroke. Based on those factors, the article, the testimony about the risks of bleeding and about the fact that Mr. Tambaga specifically had evidence of bleeding on the scans, as found by Dr. Kirkwood and Dr. Eskridge and Dr. Chivink, the court found that plaintiff failed to prove that treatment with heparin would have prevented the second stroke as opposed to possibly killing Mr. Tambaga because he might have bled out from being given heparin. And so the court found, one, there was no evidence of breach on treatment and no evidence of causation. I'm done with those issues. If you have any questions about that, I can address any questions about Dr. Eskridge's testimony or about the loss of chance theory that plaintiff has presented. I have no questions. Judge Nelson? All right. Thank you very much for your argument, counsel. Thank you. What about that finding by the district court, counsel, that administering heparin would not have prevented the second stroke or ameliorated its effects? No one testified to that. That's the problem. No expert said that. Dr. Eskridge was the most favorable witness they had, and he didn't render an opinion about what would have happened if heparin had been given because he had to admit he couldn't tell whether it was an ischemic stroke or not. So he didn't testify that heparin would have caused a problem. Dr. Chivink said he would have provided heparin under these circumstances. Dr. Shreenivasan said she would have. And Dr. Shreenivasan said it would have prevented the second stroke. Dr. Chivink said it would have, more probable than not, limited the damage done by the second stroke. So what we have here is. . . Was there dispute as to timing when you would have administered heparin? The two neurosurgeons said it was within the standard of care to give it within five days or later. Dr. Shreenivasan said it was below the standard of care not to give it within five days. Then that's what should have been done. That's what I was asking. Was there dispute regarding timing? And I guess the answer is yes. No, it's not, because Dr. Chivink, the other neurosurgeon, said that if it was given in five days, that would be the best chance of avoiding the second stroke. So those are consistent with each other. And Dr. Eskridge did not give an opinion that if they had given the heparin within five days, it would have caused a problem. He said it could, but he never gave an opinion that said it would. There's a big difference between those two. And in a case like this, you have to have medical evidence. And that brings us to a supplemental case that I gave the court a supplemental notice on, which is the Leapsack case. And in that case, this circuit held that under AS09-20-185, you can't provide testimony on standard of care unless you're qualified in that particular field or expertise. And Dr. Eskridge was not. You object to the other bases for his expertise, but you didn't object to his qualifications as to expertise on the uses of heparin, did you? We objected to him because his report did not include any opinions on standard of care. And that's the beginning of his testimony. The judge says, oh, you're going to be limited to reading the films? And then it's a judge-tried case, so you don't have a jury where you're worried about them being prejudiced by hearing things. You've got a judge that knows what the rules are and is going to apply them, tells you what the ruling is going to be. So then he testifies about heparin. And at the end of the case, we objected on the closing statement. We objected again that Dr. Eskridge had to be held to the report and that he was going outside the report and the judge should give him little or no weight because he wasn't qualified under AS 2185 and he was going outside his report. And then, for reasons that aren't clear, the judge, after making that ruling, decides that she's going to rely on his testimony, although he's not qualified, to give a standard of care opinion. And that's really important because she says, I'm going to decide the proximate cause issue based on standard of care of what treatment should be applied. And Dr. Eskridge admitted he's not qualified in that area and he's not giving an opinion on what the standard of care would require for neurosurgeons. So Dr. Eskridge can't bridge this gap for him because he admitted he wasn't qualified and he wasn't given that opinion. So the judge basically decided that the standard of care didn't require it's a negative, didn't require the treatment of heparin, basically on her own, without any expert saying that that was correct. Of course, we argued that the correct question wasn't that. In the first place, the correct question was, was it a substantial factor in causing the harm, which is, was it important enough that a reasonable person would assign causation, think that they were responsible, the negligent party was responsible. And that's not the question she answered. She never answered the right question. And the government relies on Dr. Kohler's testimony. The judge made a specific finding that his testimony was not credible. He was negligent and he was not credible. And by the way, he said he was going to give heparin himself to... Thank you, counsel. We've got your arguments. You're a little bit over time. But I thank both lawyers for your arguments in this case and the matters submitted for decision. We'll call up the next case, Thank you.
judges: FARRIS, NELSON, NGUYEN